# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1796V**

| | |
|---|---|
| KELLI A. DUBAY,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 19, 2026 |

*JohnDavid Toren, Menzer Law Firm, PLLC, Seattle, WA, for Petitioner.*

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION DISMISSING CASE**[1]

On October 12, 2023, Kelli A. Dubay filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine she received on November 20, 2020. Petition at 1. This case was assigned to the Special Processing Unit of the Office of Special Masters.

Respondent argues that the claim cannot meet the statutory "severity requirement,"[3] and for the reasons set forth below I deem the claim appropriately dismissed on that basis.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Respondent also contests Petitioner's evidence on the Table SIRVA QAI, including the site of vaccination, onset, and other conditions or abnormalities that may explain her shoulder pain, both pre- and post-vaccination. *See* Resp. at 15-17. Because I have found that Petitioner has not satisfied the statutory severity requirement, I do not discuss those arguments herein.

## I. Procedural History

On August 28, 2024, about 10 months after this case was initiated, Respondent filed his Rule 4(c) Report arguing that Petitioner cannot satisfy the statutory severity requirement because "[t]here is no record evidence for the nearly fourteen-month post-vaccination period of any shoulder symptoms at all." Rule 4(c) Report at 14. Respondent also argued that, even if severity was established, Petitioner could not prove a Table SIRVA. *Id*. at 10-12. Petitioner filed a Motion for Ruling on the Record ("Mot.") on May 16, 2025. ECF No. 25. Respondent filed a response ("Resp.") on July 16, 2025, and Petitioner filed a reply ("Repl.") on August 14, 2025. ECF No. 26, 28. The matter is now ripe for resolution.

## II. Relevant Facts

### *A. Medical Records*

About a year prior to the relevant vaccination event (October 11, 2019), Petitioner saw her primary care provider ("PCP") and reported chest pressure, labored breathing, and "shooting pain in shoulders, hands and feet for the last 6 months." Ex. 3 at 60. She also stated that she had swelling in her fingers and feet. *Id*. Despite additional testing, Petitioner was diagnosed only with joint stiffness. *Id*. at 60-63. On November 27, 2019, Petitioner returned to her PCP and reported being in a recent motor vehicle accident that caused neck pain. *Id*. at 64.

Petitioner received a flu vaccine on November 20, 2020. Ex. 2 at 2. The relevant record indicates that the vaccine was administered to Petitioner's left arm. *Id*. Petitioner also filed a vaccine administration record for a Tdap vaccine administered to her right arm. *Id*. at 3. That record does not have an administration date, but Petitioner signed the consent form for the Tdap vaccine on the same date that she signed the same kind of form for her flu vaccine (10-17-2020). *Id*. at 2-3.

The next relevant record is from January 13, 2022 - 14 months post-vaccination - when Petitioner saw her PCP complaining of "bilateral shoulder pain." Ex. 3 at 10. She maintained that the pain "started after receiving 2 vaccines, one in each arm" and had lasted longer than one year. *Id*. She added that "for 4 months after [the] vaccines that she wasn't able to lift her shoulders [sic]." *Id*. She stated that the "pain never goes away" and that the right was worse than the left (which "generally only [felt] painful at night, or when doing physical activity"). No shoulder exam was recorded, but Petitioner was referred to physical therapy. *Id*. at 9.

Petitioner began physical therapy on January 31, 2022. Ex. 4 at 1. She reported that she "got her flu and Tdap shot (one in each arm) in her upper arms and she was unable to lift her arms for four months after." *Id*. She said that "since then the pain has not gone away." *Id*. On

exam, Petitioner had decreased range of motion in both shoulders. *Id*. at 2. She continued with physical therapy treatment for both shoulders through March 21, 2022 (her 12th session). *Id*. at 29 (at her last session, Petitioner continued to report "difficulty with lifting R and L shoulder above 90 degrees.").

On March 11, 2022, Petitioner saw a sports medicine specialist for bilateral shoulder pain. Ex. 3 at 27. She reported that "18 months ago she received some routine vaccinations for influenza and potentially DTaP, influenza in her right shoulder and the other one in her left shoulder." *Id*. She stated that "after these vaccinations she developed rather severe pain, potentially some redness and inflammation or swelling in her bilateral shoulders." *Id.* at 27-28. She reported trying to treat her symptoms with activity modification. *Id*. at 28. Petitioner noted that her left shoulder pain and loss of range of motion improved during physical therapy, but her right shoulder "continue[d] to be very problematic." *Id*. Petitioner's exam was consistent with "bursitis which led to adhesive capsulitis of the right shoulder." *Id*. at 29. The doctor ordered an MRI of Petitioner's right shoulder and advised continuing physical therapy and home exercises for both shoulders. *Id*.

An MRI of Petitioner's right shoulder taken on April 6, 2022 revealed supraspinatus, infraspinatus, and subscapularis tendinosis, Grade 1 atrophy of the subscapularis muscle, and mild osteoarthritis. Ex. 5 at 12.

Petitioner returned to the sports medicine specialist on May 4, 2022, to review her MRI results. Ex. 6 at 67. She reported some improvement with continued physical therapy. *Id*. The doctor assessed "multifactorial right shoulder pain with underlying mild to moderate glenohumeral and acromioclavicular arthritis in the context of her rotator cuff tendinopathy." *Id*. at 69. He prescribed meloxicam, advised continued physical therapy, and offered a cortisone injection. *Id*. Petitioner declined the injection, opting for a referral to an orthopedic surgeon to evaluate any surgical options. *Id*.

Petitioner then saw an orthopedic surgeon on June 2, 2022. Ex. 6 at 7. She reported "about a year and a half of ongoing right shoulder pain" that she "attribute[d] to an adverse reaction from a flu vaccine." *Id*. She explained that she had "an inflammatory reaction and was quite painful and sore about 2 weeks after the injection and has remained so." *Id*. The doctor administered a cortisone injection and advised focused physical therapy for range of motion and strengthening and ibuprofen for pain. *Id*. at 9. She returned on June 28, 2022 reporting less pain and improved range of motion with lifting over her head. *Id*. at 15. The doctor encouraged formal physical therapy and an intra-articular injection. *Id*. Petitioner had the intra-articular injection on July 7, 2022. *Id*. at 18.

Petitioner began a second course of physical therapy on July 14, 2022. Ex. 6 at 20. She attended 15 sessions through September 19, 2022. *Id*. at 24-57. At her last session, she reported that "her motion [felt] good" but she still had pain with overhead reaching. *Id*. at 57. She followed up with her orthopedic surgeon on September 12, 2022, reporting "slow and steady progress." Ex. 6 at 53. He advised continued physical therapy to work on strengthening. *Id*.

After another, more than one-year gap in treatment, Petitioner saw a new primary care physician on December 15, 2023 (15 months later), and discussed her shoulder concerns. *See* Ex. 8 at 28. She also in early 2014 saw her sports medicine specialist and received another cortisone injection. *See* Ex. 8 at 59-63; 70-74.

*B. Witness Testimony*

Petitioner filed two affidavits in support of her claim – one with her Petition in 2023, and one filed with her Motion for a Ruling on the Record in 2025. Ex. 1; Ex. 9. In both, she states that she "specifically recall[s] the influenza vaccination being administered into [her] right shoulder and the TDAP vaccine into [her] left shoulder." Ex. 1 at ¶3; Ex. 9 at ¶5. She recalled immediate pain upon vaccination that "never resolved and instead progressed over the following days and weeks." Ex. 1 at ¶4; Ex. 9 at ¶6.

Petitioner stated that she "initially believed [her] shoulder pain would resolve with time" and attempted to treat her symptoms with "rest, ice/heat, and NSAIDs." Ex. 1 at ¶5. She stated that at the time of her vaccination, she had recently moved to Seattle for her job and had not established care with a new PCP. Ex. 1 at ¶7; Ex. 9 at ¶9. She stated that she "informally consulted" with medical professionals at her employer (where she received the vaccines) about her shoulder pain and was advised that her pain would resolve with conservative treatment and time. Ex. 1 at ¶6-7; Ex. 9 at ¶8-9. She expressed that she was "hesitant to go to providers at the [employer] for treatment when the potential cause of [her] symptoms was a vaccine administered by one of [her] coworkers which [she] believe[d] to be potential medical malpractice based on the site of administration." Ex. 9 at 9; *See also* Ex. 1 at ¶7. Petitioner added that she did not seek earlier treatment due to "barriers to medical care cause by the COVID pandemic." Ex. 1 at ¶7; Ex. 9 at ¶9.

Petitioner maintains that in "mid-August 2021, [she] left her job . . . and moved back to Vancouver, Washington." Ex. 1 at ¶8; Ex. 9 at ¶10. She said that "now that [she] was no longer at [employer], [she] began reaching out to law firms to find out whether [she] had a malpractice claim." Ex. 9 at ¶10. She explained that she "was advised that additional medical treatment beyond home conservative measures could be helpful in [her] recovery." *Id*. She stated that "toward the end of the year, [she] began efforts to get a primary care appointment," and was not

successful until January 2022. *Id*. She stated that her pain continues to the present. Ex. 9 at ¶12.

In her second affidavit, Petitioner addressed the records of shoulder pain from before her vaccination. Ex. 9 at 3. She stated that "[her] recollection is that the shooting pain was really an issue in [her] extremities impacting [her] hands and feet and did not cause meaningful pain or limitation to [her] shoulders." *Id*. She stated that the pain "resolved on its own in late 2019 and has not been an issue since." *Id*.

Petitioner also addressed the car accident referenced in records prior to her vaccination. Ex. 9 at ¶4. She "recall[ed] having some minor soft tissue pain in [her] neck" after the accident, although she did not seek medical treatment. *Id*. She recalled that said pain resolved within months. *Id*.

Petitioner's daughter, Kylian Dubay, filed an affidavit dated May 16, 2025. Ex. 10. She stated that she and Petitioner "have spoken on the phone on a near daily basis and also often exchange text messages" since Petitioner's vaccinations. *Id*. at ¶2. She "specifically recall[ed] [her] mom talking to [her] about the" vaccinations and her shoulder pain. *Id*. at ¶3. She recalled Petitioner talking about having pain immediately after the flu vaccine and that the pain got worse. *Id*. at ¶4. Ms. Dubay recalled encouraging Petitioner to seek medical treatment, but Petitioner told her "she had discussed the issue with the medical providers at work and that she was told some pain was normal and it would improve with time." *Id*. at ¶5. She also stated that Petitioner "is tough and is reluctant to complain, which also contributed to her delay in seeking treatment." *Id*. at ¶6. She stated that "it was only after months of living with the pain became unbearable and she was able to get away from her job . . . and the advice of the providers there that she was able to move forward with seeking treatment and starting her healing process." *Id*. at ¶7.

Petitioner's son, Smith Dubay, also filed an affidavit dated May 16, 2025. Ex. 11. He stated that he has been "in near daily contact" with Petitioner since her vaccinations. *Id*. at ¶2. He stated that he "specifically recall[ed]" Petitioner "reporting shoulder pain to [him] after the November 20, 2020 vaccination." *Id*. at ¶3. He recalled Petitioner "talking about challenges putting on clothing" due to her shoulder pain. *Id*. Mr. Dubay stated that he talked to Petitioner about going to a doctor for treatment, but that "[s]he was hesitant to do so because she'd gone to coworkers . . . and they'd told her the pain would get better and the only thing to do was ice and take ibuprofen." *Id*. at ¶4. He stated that Petitioner "is generally not one to complain and despite [him] urging her to seek treatment, she did not do so until after she left her job . . . out of concern for creating problems for herself at work and out of hope that the pain would get better if she could just tough it out." *Id*. He recalled text messages with Petitioner from December 6, 2020 in which she discussed "her inability to lift her arm in the weeks since her flu shot," which have been filed as an exhibit in this case. *Id*. at ¶5. He stated that although Petitioner did not

seek treatment, he "can attest that she was in considerable pain in the year following the vaccination" and that her physical activities have been "significantly impacted." *Id*. at ¶6.

## III. Authority

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Section 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. Section 13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the

medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## Analysis

Respondent contests whether the existing medical record supports the conclusion that Petitioner likely suffered the residual effects of her vaccine injury for more than six months, as required by the Vaccine Act.[4] Resp. at 12-14. Because Petitioner received a covered vaccine on November 20, 2020 (and alleges an immediate onset of pain, although that issue is also disputed), she must establish that her symptoms continued until at least May 20, 2021. Ex. 1 at ¶4; Ex. 2 at 2; Ex. 9 at ¶6.

As Respondent notes, there are no objective records evidencing shoulder pain until fourteen months after Petitioner's November 2020 vaccination. *See* Resp. at 14. This is an inordinately-long gap in treatment. Although initial treatment delays are not uncommon in SIRVA cases, "this does not mean that a petitioner can prevail no matter the length between vaccination and their first medical treatment. As the treatment delay becomes longer, the evidence becomes less contemporaneous, weakening [the] claim." *Corbosiero v. Sec'y of Health & Human Servs.*, No. 21-0576V, 2024 WL 5356555, at *6 (Fed. Cl. Spec. Mstr. Dec. 16, 2024). And I have found that severity has not been established in cases involving shorter delays than in this case. *See,* e.g., *Holbrook v. Sec'y of Health & Human Servs.*, No. 22-0589V, 2025 WL 3710094, at *7-9 (Fed. Cl. Spec. Mstr. Nov. 19, 2025) (lack of formal treatment for nearly ten months); *Corbosiero,* 2024 WL 5356555 at *6 (11-month delay). Although facially-lengthy delays can be overcome, Petitioner has not cited any cases in which a delay approaching a year and a half, as here, was found to satisfy the severity requirement. *See* Resp. at 2-3.

---

[4] In her Motion, Petitioner erroneously stated that "Respondent does not dispute that Petitioner has satisfied" the severity requirement, despite the fact that Repsondent first made the argument in his Rule 4(c) Report. Mot. at 13; *See also* ECF No. 16. She provided her arguments on the issue in her Reply. *See* ECF No. 28.

The only reasonably objective evidence of shoulder pain during the entire 14-month period were text messages sent on December 6, 2020 – about three weeks after Petitioner's vaccination. Ex. 12. Those alone are not proof that Petitioner's pain continued another five months and beyond, however, even if they do support the contention that a vaccine-related injury initially occurred. And although Petitioner's later medical records reference her vaccination, and her subjective reports that she had experienced shoulder pain since that time, they inherently deserve less weight than the very absence of proof from the severity timeframe and beyond. (This is especially so where, as here, the claimant acknowledges that she sought formal medical treatment in connection with her claim. *See* Ex. 9 at ¶10).

The affidavits filed in this case attempt to fill this records hole with a reasonable explanation for Petitioner's delay in seeking treatment. *See* Ex. 1, 9. They have some evidentiary value, but they are generally lacking in corroboration. Indeed, their assertions are frequently undermined in the filed records. Petitioner maintains, for example, that she "initially believed [her] shoulder pain would resolve with time . . . and attempted to treat [her] symptoms with conservative measures such as rest, ice/heat, and NSAIDs." Ex. 1 at ¶5. Yet when she finally sought treatment on January 13, 2022, she told the doctor that she had "not done anything at home to treat her symptoms." Ex. 3 at 10. At most, Petitioner told her physical therapist that she had tried treating her symptoms through "activity modification." *Id.* at 28.

In addition, Petitioner states that when her pain did not resolve "in the months following vaccination," she "informally" consulted with medical professionals at work, but was told that "nothing could be done about the pain except conservative measures . . . and that the pain would eventually resolve on its own." Ex. 9 at ¶8. Yet this statement is inconsistent with her other representation that she "was hesitant to go to providers at the Polyclinic for treatment" because they may have caused her injury. *Id*. at ¶9. Thus, Petitioner argues both that she did consult professionals at her employer about her shoulder pain and was told there was no available treatment, while maintaining that she was hesitant to go to seek treatment in the first place. And Petitioner's affidavits lack any significant details regarding the timing of her symptoms, her attempts at home treatment, and her consultations with others. Both are silent about the relevant period in May 2021 (or thereabouts).

Petitioner also states that, at the time of her vaccination, she had not found a new PCP in Seattle, where she had recently moved for her job, which contributed to her delay in seeking treatment. Ex. 1 at ¶7; Ex. 9 at ¶9. But Petitioner's prior PCP had offices in Seattle, including one where Petitioner indicated she was seen for behavioral health care between February 10, 2020, and April 29, 2022[5] – a timeframe spanning the entire fourteen-month period in which she

[5] Petitioner argued that "it is also extremely notable that [she] did not seek medical care of any kind during this 14-month gap in treatment" as evidence for her reasoning for delaying shoulder-specific care. Resp. at 3. Although the behavioral health treatment between February 2020 and April 2022 is noted on the PAR Questionnaire, medical records for that provider and period were not filed.

did not seek treatment for her shoulder pain. *See* ECF No. 6 at 3 (Pre-Assignment Review (PAR) Questionnaire); *See also* www.seamar.org/seamar-clinics.html#m=nV. Therefore, the record establishes that Petitioner had the ability to seek care in Seattle (and seemingly did so for mental health conditions) – and she has not explained what circumstances stopped her from seeing a PCP in Seattle for more than a year.

Petitioner further represents that she left her job in Seattle and moved back to Vancouver, WA, in mid-August 2021 (now ten months after her vaccination). Ex. 1 at ¶8; Ex. 9 at ¶10. In her first affidavit, Petitioner stated that once she moved, she sought treatment for her shoulder pain from her prior PCP. Ex. 1 at ¶8. In her second affidavit, she clarified that before seeking treatment, she first "began reaching out to law firms to find out whether [she] had a malpractice claim." Ex. 9 at ¶10. She then admitted that she was "advised that additional medical treatment beyond home conservative measures could be helpful in [her] recovery." *Id*.. Thus, Petitioner's second affidavit (which was filed on the same day as her Motion for a Ruling on the Record) suggests that she sought formal medical treatment primarily to bolster her claim in the Vaccine Program, rather than to remedy ongoing symptoms. Taken together, Petitioner's explanations for the delay in treatment is simply not sufficiently "consistent, clear, cogent, and compelling" to outweigh the impact of the gap (which supports the view that Petitioner never experienced a SIRVA, or that any injury she did experience did not persist in residual effects for the required six-month period). *Camery*, 42 Fed. Cl. at 391.

The third-party affidavits, both from Petitioner's children, are non-specific and too similar to each other to give them great weight. *See e.g.* Ex. 10 at ¶3 (Petitioner's daughter "specifically recall[ing] [her] mom talking to [her] about the November 20, 2020 vaccination and the shoulder pain she was experiencing after."); Ex. 11 at ¶3 (Petitioner's son "specifically recall[ing] [his] mom reporting shoulder pain to [him] after the November 20, 2020 vaccination."). Neither witness provided any specificity - other than claims of immediate onset and worsening in the "days following the vaccination" - with respect to the timeline of Petitioner's injury, or how they obtained their knowledge (other than Petitioner's word). Ex. 10 at ¶4; Ex. 11 at ¶3. Both children discussed how their mother could no longer complete home improvement projects or repairs, but neither provided any specific project or repair that was left unfinished or required assistance. Ex. 10 at ¶6; Ex. 11 at ¶6. Finally, both children noted that Petitioner was advised to treat her pain with home remedies, but neither stated that they observed her doing taking any action at any time. "Such testimonial evidence is not convincing in the context of a complete lack of contemporaneous documentary evidence." *Corbosiero,* 2024 WL 5356555, at *6 (discussing affidavits that were "conclusory, lacking in supporting details, and devoid of explanation as to how the declarants were able to recall the information so long after the events in question.").

In the end, there is a complete dearth of evidence in the record (other than her word or the representations of family members) that Petitioner was experiencing shoulder pain in May

2021 – six months after her vaccination. There are no medical records from the six-month timeframe, from the date of vaccination (when a SIRVA would usually be expected to first manifest) to the end of the severity timeframe. And the Vaccine Act prohibits me from relying solely on a Petitioner's self-assertions. Section 13(a)(1)(A). A lack of reasonably-contemporaneous evidence establishing treatment for what is understood to be an acute, even alarming injury cannot in all cases be cured – and the delay here is simply too long to overlook.

Given the above, I cannot conclude that Petitioner suffered the residual effects of her vaccine-related injury for the six months required by the Act.

## CONCLUSION

Because Petitioner has failed to meet the statutory severity requirement set forth in Section 11(c)(1)(D)(i), Petitioner cannot establish entitlement and therefore, I must **DISMISS** her claim in its entirety. **The Clerk shall enter judgment in accord with this Decision.[6]**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[6] If Petitioner wishes to bring a civil action, he must file a notice of election rejecting the judgment pursuant to § 21(a) "not later than 90 days after the date of the court's final judgment."